Case number 21-1521, United States of America v. Calvin McReynolds Jr. Oral argument is not to exceed 15 minutes per side. Ms. Salinas, supervising attorney, you may introduce the appellant counsel. Good afternoon and may it please the court. I'm Melissa Salinas and I wanted to thank the court for allowing our third-year law student Anna Shuver to present the case. I will be here supervising her. Thank you. Thank you and counsel you may proceed. Your honors and may it please the court. My name is Anna Shuver and I'm here on behalf of Mr. Calvin McReynolds. I'd like to reserve four minutes for rebuttal. Mr. McReynolds appeals his sentence for a second time today because the district court failed to adequately remedy concerns this court articulated when vacating his first sentence. In his first opinion, this court directed the district court to adequately explain any deviations the jury found facts by a preponderance of the evidence. But once again, the district court made sweeping conclusions that Mr. McReynolds was liable for the full drug quantity despite a glaring lack of evidence of agreement to engage in the conspiracy's full scope. This court should find again that the district court's relevant conduct determination was not supported by sufficient explanation or evidence. Mr. McReynolds requests this court vacate his sentence and remand for expedited resentencing before a new judge with instructions to impose a sentence consistent with the jury found drug amounts. Under this court's decision in United States v. Emerson, the district court's relevant conduct determination should be reviewed de novo. Okay, Ms. Schubert, before you move on, you want us to order the district judge to sentence him to the sentence that the guidelines would provide with the lower quantity? Is that what you're asking? Your Honor, we're asking that the instructions direct the lower court to use the drug amounts that the jury found during the trial. Okay, use them as advisory guidelines. Is that more precise? Yes, Your Honor, that is correct. You're not asking us to impose a specific sentence. I mean, you recognize that's discretionary with the district judge, but you want us to have him apply the advisory guidelines as you calculated based upon the lower quantity of the drugs, right? Yes, Your Honor, that's correct. Okay, thank you. Thank you. Under this court's decision in United States v. Emerson, the district court's relevant conduct determination should be reviewed de novo because Mr. McReynolds only challenges the legal conclusion of the I thought he was challenging the facts that support the relevant conduct. No, Your Honor. Well, the scope of the agreement is what you're really challenging, is it not? Your Honor, Mr. McReynolds is challenging the relevant conduct determination, which is governed by this court's decision in U.S. v. Campbell. But I'll add that even if this case is reviewed under plain error, we would advise that this court still rules in Mr. McReynolds' favor because there's no plausible reading of the record that would support finding a preponderance of the evidence to support a deviation from the jury found facts. Okay, I thought the case rose or fell based upon the scope of defendant's agreement as to the conspiracy. And the scope of the agreement, I think, is a factual issue. And factual issues we review for clear error. Is that right? I would direct you to the language in Emerson, which says that relevant conduct determinations are a question of application of law to facts, and in which case Emerson applied de novo review. Counsel, what we have here, I guess, is a case in which the jury, even though their sentencing determination may have been advisory, were instructed to arrive at their sentencing determination beyond a reasonable doubt. And now we have the district judge deciding, based upon the preponderance of the evidence, to supplant the jury's beyond a reasonable doubt determination with respect to sentencing. What the judge did here, of course, is within legal bounds to the extent he complies with U.S. v. White. But in White, there was no sentencing determination by the jury, so that this situation is a little bit distinguishable factually. What legal significance is there in the fact that the judge is making a preponderance of the evidence determination, which is contrary to the jury's beyond a reasonable doubt determination with respect to the sentencing? Yes, Your Honor. So the legal significance in this case of asking the judge to have to make a finding of a preponderance of the evidence is to preserve the purpose of the jury. If the jury is asked to make a finding on a specific question, and it made an affirmative finding, as it did in this case, beyond a reasonable doubt, then in order to preserve that jury's purpose, we shouldn't allow courts to displace the jury's decision or verdict without there being some sort of bar. And this is why we're urging this court to consider adopting the approach the Ninth Circuit follows in Pimentel v. Lopez, because that case describes the situation here in which the case, the jury made an affirmative finding, as opposed to, as you pointed out, a merely acquitted conduct, as was the case in this court's decision in White. Are there other courts that disagree with that? Isn't there relatively a split on whether you can, on whether it's as clear a rule as you suggest? Uh, so other courts, in my understanding, have looked at the question, um, as it's posed in White. Um, I would have to go back and review the case law to, um, determine whether any other circuit has ruled on the specific question where there's been an affirmative finding beyond a reasonable doubt. So I'd like to direct the court's attention, um, to the preponderance of the evidence point. In McReynolds 1, this court described several pieces of evidence that were noteworthy or absent from the government's case, none of which the district court addressed adequately on remand. First, throughout law enforcement's 14-month investigation into the conspiracy, they found no physical evidence implicating Mr. McReynolds. No fingerprints, no appearance of his name on any ledgers or logs. Second, law enforcement had a poll camera that had surveillance footage showing the co-conspirators constantly coming and going from the Grant Street stash house. McReynolds never entered. Third, there were eight search warrants executed. None returned any evidence implicating Mr. McReynolds. His name was never even listed as a suspect on any lab reports associated with the searches. There's certainly a thin record, counsel. Um, that's pretty clear based on what we have. I'm wondering what your about price fixing conversations two or three times. Um, why would that not constitute evidence of the existence of a single scheme? Uh, well, I would like to provide two responses to that briefly, Your Honor. Um, first is that when you look at the Pratt testimony specifically in the record, um, he only testifies that Mr. McReynolds was perhaps present in the same location during one or two of those conversations. Um, that would not be consistent with Mr. McReynolds having engagement, um, and participating in the conspiracies price setting over a large period of time, such as 14 months. Um, the second point I'd like to make is that Brandon Pratt also testified, um, that he had a falling out with Mr. McReynolds long before the conspiracy period began back in 2013, and that Mr. McReynolds liked to do his own thing. Um, so when considering a preponderance of the evidence, um, Mr. Pratt's testimony certainly doesn't reach that level. Um, continuing on with more evidence that doesn't reach, uh, that is notably lacking from this case, um, there were 50 controlled buys, and none of those controlled buys involved Mr. McReynolds. Um, as, as I just discussed testimony from the government star witness, Mr. Pratt, and another witness, um, Ms. Acosta, were consistent with Mr. McReynolds simply being a less culpable small-time dealer of drugs, um, which shouldn't be swept in to the conspiracy's full range of activities under this court's decision in Campbell and in Pruitt. And, um, as this court acknowledged in its first opinion, the plea agreements of the conspiracy's leader, Mr. Beavers, and main supplier, Mr. Riley, named every co-defendant except Mr. McReynolds. The district court did not address this. Let me ask you, is the entire case dependent upon, um, the scope of the agreement that he entered? It seems to me that much of your briefing almost suggests that you concede that the amount of drugs was foreseeable to Mr. McReynolds. Is that correct or wrong? Uh, yes, your honor. We would concede that the evidence shows, um, under the Campbell test, Mr. McReynolds, uh, it could be said that Mr. McReynolds could foresee the conspiracy, but it's certainly... So that's a, that's a fair inference that the court could have made, but could not make the inference that it was within the scope of his agreement. Correct. Okay, thank you. Um, the district court did not address this glaring lack of evidence on remand. Instead, it relied solely on evidence that this court, McReynolds one, said established only that Mr. McReynolds was a dealer who was merely purchasing cocaine from other members of the conspiracy for distribution. So for all of these reasons, the district court did not adequately explain or support its attribution of the conspiracy-wide quantities. Mr. McReynolds respectfully asked this court to vacate his sentence and remand for to impose a sentence using the jury found drug amounts. Thank you. All right, we'll hear from the government. Thank you. Good afternoon. May it please the court. William Ballincourt appearing on behalf of the United States. There were two prongs for the district court to determine and deciding the attributable drug quantity. First is whether the acts were within the scope of the defendant's agreement. In other words, was this jointly undertaken criminal activity or were they separate criminal activities? The second prong was foreseeability, which opposing counsel has conceded that the evidence establishes that. So I'm going to focus on whether the drug quantities attributed to the defendant were within the scope of his agreement. And as the court has identified, that's a fact-dependent determination, which is reviewed for clear error. Here are the amount that... But it's your burden to prove it, right? Yes. And here the amount seen is properly reflects the scale of the offense, that this was a snapshot in time of a more than year-long conspiracy of dealing heroin, cocaine, and crack. Now, while knowledge of the scope of the overall operation is not enough on its own to determine if the quantity is within the scope of the defendant's agreement, the court can look at an implicit agreement that's fairly inferred from the conduct of the defendant and the others. And here you have knowledge plus a wide range of conduct by the defendant with his co-conspirators. And this supports the district court's factual findings that the quantity C's reflected the scale of the offense, and this was within the scope of defendant's agreement. What time frame are we talking about that McReynolds associating with the alleged co-conspirators? I mean, we're not just talking a few months, are we? We're talking a considerable length of time that he had this arrangement, or he was associating with whatever we want to say. How long a period are we talking about? Well, the conspiracy was charged over a extended period before the dates included in the conspiracy. The testimony was that Mr. McReynolds was lifelong friends with all the individuals, or most of the individuals involved here. You know, they all grew up on the south side of Saginaw. That's part of what I'm struggling with with your briefing. Let's say they did all grow up together. Let's say they've known each other Why does that show that it was within the scope of this defendant's agreement? All of the activity that went on in the conspiracy of what, seven or eight other people? Well, I think when you look at the evidence and focus on the question, is the offense appropriately viewed as jointly undertaken criminal activity, or is it a number of separate activities? And I want to discuss three groups of evidence that show the scope of the agreement. The transactions that occurred at the kitchen, the extent of the drug sales that McReynolds made with Acosta, and then the coordination, the wide coordination, extensive coordination with the other conspirators. Turning first to the kitchen, what this shows is that the defendant was his co-conspirators other than Beavers, and that kilo quantities were within the scope of the agreement. So if he was at, if he was present at that location to purchase drugs for sale, that another party came in carrying some sort of big sack of bricks, as it's alleged, that's sufficient to show that he was a part of that part of the conspiracy? Tell me what ties him to that, if what he's doing there is packaging his own drugs and leaving. Well, because what is going on is, is a pre-arranged location. He's meeting there with two other conspirators. One of the conspirators, Stevens, shows up with a duffel bag with the five or six bricks, lays it out on the table. And then when this conspirator, Stevens, identifies that Acosta is there, he talks to McReynolds and says, remember, she's not allowed to be here. And so she leaves. McReynolds stays within the kitchen with the two other conspirators, with the five or six bricks of heroin and cocaine, and then comes out and does his drug deal with Acosta. This is clearly a location, a pre-arranged meeting location where they're going. Let me ask, why is that a pre-arranged meeting location that's indicative of a conspiracy, as opposed to a pre-arranged meeting location where this guy goes all the time to buy the drugs that he buys about every four days? Well, this was a pre-arranged, this was more than just a pre-arranged location to sell the drugs to Acosta, because Stevens shows up with the bricks of five to six bricks of other drugs. But the question is what Mr. McReynolds is there for, not what the other co-defendant is there for. There was also testimony that what Acosta sees is McReynolds and Stevens actually packaging significant amounts of drugs, breaking them down, packaging them into retail distribution amounts in keto papers. Counsel, the problem with that is that the defendant claims that, well, actually, the district judge based his findings in regard to what happened in the kitchen, as I understand, and you can correct me if I'm wrong, on the testimony of Acosta. But the judge's rendition of Acosta's testimony with respect to what happened in the kitchen was not accurate, in that the judge seemed to think that Mr. McReynolds was in there either packaging or cooking some drugs, and that's not really what Acosta said transpired. Maybe Mr. McReynolds was doing that, but that's not what the testimony was that the judge relied upon with regard to this episode in the kitchen. So you can address that if you like, but that does seem to be relatively significant. Well, the judge made a specific finding during sentencing that he found Acosta to be credible. And what he didn't do is attribute the actual bricks of cocaine and heroin in his calculation because he found that the measurement was, quote, imperfect. But the court found her testimony credible, and the significance of her testimony is she's describing bricks of a controlled substance, regardless of what the precise weight was. Clearly, they weren't there with Play-Doh. These were drugs that they were being brought in or being sold to Acosta. But your opposing counsel concedes that the amount of drugs was foreseeable. So that's not something that's at issue here. What's at issue here is the scope of Mr. McReynolds' agreement. Please, go ahead. And when you look at his conduct, and so you actually have him hands-on with kilos of drugs and breaking it down into smaller quantities, that shows that this was, in fact, joint criminal activity and not separate crimes. So it was a part of his agreement. Even if all he broke down was what he bought? He did more than break. Well, he's buying kilos. No, he was buying what he came out with to sell to Acosta, that level. He was buying those amounts. Well, I mean, if you look at what he was buying, I mean, the testimony showed that he was buying at least a half ounce every four days over a 60-day period. Now, if you extrapolate that, and that was only during the period, the 60 days that his beaver's bones were being tapped. But if you extrapolate that over the course of the conspiracy, that easily goes to multiple kilos of cocaine that McReynolds admitted that he was selling. So, but, you know, I'm struggling with that argument because under that argument, any street dealer that buys consistently from a supplier is a member of the supplier's conspiracy. Well, but we have more than simply buying from beavers. You have him coordinating his sales with other conspirators. You have him, for example, there was testimony that he and Kendall phone and then go out to catch the sales. And there was also testimony that he was working together with Eugene Smith and Michael Pratt to cooperate in drug sales. And then Ms. Acosta even testified that when she would buy drugs from, she would make her deal with McReynolds, call him for the drugs, but then other conspirators would show up to consummate the delivery. She identified five other conspirators that completed the deals that she had worked out with McReynolds. So this shows that he is acting in concert with these folks throughout the course of the conspiracy. You also have discussions of when beavers owed McReynolds money, beavers told McReynolds to go one of the other co-conspirators and to get the money from the spot, which was the home of yet another conspirator. So McReynolds' conduct was not just simply dealing with Mr. Beavers, who was dealing with all of the other conspirators. And in fact, there was evidence at one point that Mr. Beavers... Counselor, let me just ask you now, the judge thought that Acosta and McReynolds were seen making drugs together in the kitchen, and that's really not what the testimony is. To what extent should we be troubled by the mischaracterization of the actual testimony at trial? Well, what Acosta testified to is that she observed McReynolds and Stevens cutting the drugs into smaller quantities. And the court referred to this as breaking it down for retail distribution. I don't think that there was testimony from Crabb about how he and McReynolds would cook cocaine to create crap. I don't recall that Acosta specifically testified as to that, but there was testimony from Pratt about them engaging in that conduct in order to... I thought Pratt's testimony was that he never bought, sold, or cooked drugs with McReynolds because McReynolds liked to do his own thing. Isn't that the testimony that Pratt gave? No, my recollection of the testimony was that, and there was a lengthy part of his direct examination where he described the process that they would follow to cook crack out of cocaine. And he testified that, yeah, they were friends. And in fact, I think McReynolds was even the godfather of one of Mr. Pratt's children. He did testify that they weren't as close as they used to be. And that in his view that, yeah, sometimes that McReynolds was doing his own thing. But he didn't testify that sometimes he was doing his own thing, counselor. He testified that McReynolds liked to do his own thing. I've struggled a little bit with the briefing here because we've got a number of conclusions in the briefing about events that occurred as if they occurred routinely. But in this record, am I incorrect that there was only one instance where Beavers warned McReynolds about law enforcement and only one instance where Beavers asked about a scale? Now, am I right or wrong on this record? In the instance regarding the warrant, yes, there was one warning in the 60 days. But the significance of that is Beavers didn't warn him on his own. The reason Beavers called McReynolds is Beavers received a call from Lamar Simon, who was one of the other co-conspirators. He called Beavers to say, hey, you need to warn McReynolds because the police are in the area where he's going and where his spot is. And then Beavers called McReynolds to warn him. So was the act of another conspirator. Whereas if McReynolds was simply an independent contractor with nothing to do with anybody else, why was one of the other conspirators calling Beavers to say, hey, you need to warn McReynolds? It's because they were acting together to protect each other. Well, it could also be because McReynolds was one of his habitual customers in buying drugs, and he didn't want anything to happen to one of his customers. Well, that could be one of the explanations. But the standard of review we're talking about here is clear error. And the court drew the inference from this conversation, as well as all of the other circumstances, that this was, in fact, jointly operated activity. This wasn't separate criminal conduct involving a meth lab or guns. It was heroin and cocaine. And I see my time has wired up evidence that was not before the jury or at trial. He did say in arriving at his sentence, he did take into account wiretap evidence, as well as a lot of other things. What would be the legal significance of that? Well, because the question is whether the court finds by a preponderance of the evidence, it's not bound by the evidence that's introduced before the jury. And the wiretap evidence was information that the defense had in their possession. I think the court referred to that in its order and its findings. And I think the only thing the court said about the wiretaps was that it was certainly consistent that this was merely the amounts he was attributing was a mere snapshot, and that the conspiracy actually was dealing in much greater amounts. Thank you. Any rebuttal? In rebuttal, I would like to begin by emphasizing that the government has the burden today to prove by a preponderance of the evidence that Mr. McReynolds agreed to participate in the full I think you have to establish reversible error. I don't think the government does on the field. Thank you for that correction, Your Honor. The government had the burden at sentencing to prove by a preponderance of the evidence that Mr. McReynolds participated in the full scope of the conspiracy. But what actually happened in this case, and what the record supports, is that Mr. McReynolds was a small-time drug dealer who purchased from his supplier, Bieber's, to sell for individual consumption to buyer Acosta. And I'd like to make two main points in this rebuttal. I'm going to first discuss Acosta's testimony, and then I'd like to spend some time discussing the other conduct with the other conspirators or co-defendants. So first, to address points made about Acosta's testimony. Acosta testifies that she met Mr. McReynolds at the kitchen in order to purchase drugs for her individual consumption. This testimony is entirely consistent with Mr. McReynolds being a small-time seller simply in a buyer-seller relationship with Ms. Acosta. The prearranged location is simply indication that they were there to make an individual drug transaction. Even taking Ms. Acosta's testimony as fully credible, it doesn't amount to a preponderance of the evidence in light of the absence of evidence in this case. As I spent time talking about in my opening remarks, there's a glaring lack of evidence, no physical evidence, against Mr. McReynolds. And Acosta's testimony is simply not enough to overcome that lack of evidence. I'd also like to so the government brought up that there was or contended that there was some coordination with co-defendants Smith and Pratt. This is not the level of coordination that rises to agreement to participate in a conspiracy. In the Sentencing Guidelines 1B1.3, Comment 4 contains an illustration which distinguishes between small-time drug dealers who even sell in the same and those who are sharing resources and profits. The record here does not support profit-sharing or resource-sharing, nor does it reflect the kind of deep, involved coordination that was present in this court's decision in U.S. v. Donadeo. Additionally, to clarify the testimony from Brandon Pratt about cooking, Mr. Pratt did in fact testify that he never cooked, sold, or packaged drugs with Mr. McReynolds during the conspiracy period. He did discuss that back in 2011, before the period which the current charges of the conspiracy involve, that there was more interaction between him and Mr. McReynolds. However, that was not the charged conduct. We would encourage the court to review that testimony carefully because it does not support any coordination between Mr. McReynolds and other co-defendants that would rise to the level of agreement to participate in the scope of the conspiracy. Finally, I would like to point out that the conduct involving Mr. McReynolds and Mr. Beavers, be it sharing scales or warnings, that does not support agreement to participate in the conspiracy. It's consistent with a supplier-seller relationship that's still part of the single chain of purchasing drugs from Mr. Beavers in order to individual dealer. So for all of these reasons, Mr. McReynolds respectfully asks this court to vacate his sentence and remand for expediting resentencing before a new judge. Thank you. All right, thank you very much and the case shall be submitted.